# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### EASTERN DISTRICT

JOYCE HENDERSON,
 Plaintiff

v.                                           COURT FILE NO.: 05-10339 JLT

SHERMAN FINANCIAL GROUP, LLC;
SHERMAN ACQUISITION II, LP;
SHERMAN ACQUISITION II GENERAL
PARTNER LLC; ALEGIS GROUP, LP AND
ALEGIS GROUP, LLC,
 Defendants.

## AFFIDAVIT OF STEVEN S. BROADLEY

Steven S. Broadley, on oath, deposes and says that he has personal knowledge of the following facts, except those stated on information and belief, and as to those he believes them to be true.

1. I am an attorney admitted to practice and in good standing before the Courts of the Commonwealth.

2. I am the attorney for the defendants in this matter.

3. On November 1, 2005, I took the deposition of the plaintiff Joyce Henderson.

4. Attached to this Affidavit is a true and accurate copy of the transcript of that deposition. Also attached are true and accurate copies of Exhibits 4 and 5 from that deposition.

SIGNED UNDER THE PENALTIES OF PERJURY THIS ___5___ DAY OF DECEMBER, 2005.

_____
Steven S. Broadley

## CERTIFICATE OF SERVICE

I, Steven S. Broadley, Esquire of Posternak, Blankstein & Lund, LLP, hereby certify that on this ⸤ day of December, 2005, I caused a copy of the **Affidavit of Steven S. Broadley** to be mailed to:

Jeremy P. Monteiro, Esquire
Edelman, Combs, Latturner & Goodwin, LLC
120 S. LaSalle Street, 18th Floor
Chicago, IL  60603-3403

Michael S. Poncin, Esquire
Moss & Barnett, P.A.
4800 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402

Christopher M. Lefebvre, Esquire
Law Offices of Claude Lefebvre & Sons
Two Dexter Street
Pawtucket, RI  02860


_____
Steven S. Broadley

1

```
 1                              Volume:  I

 2                              Pages:  1-41

 3                              Exhibits: 1-5

 4          IN THE UNITED STATES DISTRICT COURT

 5            FOR THE DISTRICT OF MASSACHUSETTS

 6                    EASTERN DIVISION

 7

 8     ----------------------------------

 9    JOYCE HENDERSON,

10                  Plaintiff,        Docket No.

11       v.                          05-CV-10339 JLT

12    SHERMAN FINANCIAL GROUP, LLC;

13    SHERMAN ACQUISITION II, LP; SHERMAN

14    ACQUISITION II GENERAL PARTNER, LLC;

15    ALEGIS GROUP, LP; and ALEGIS GROUP, LLC;

16                  Defendants.

17     ----------------------------------

18

19          DEPOSITION of JOYCE HENDERSON

20        Tuesday, November 1, 2005, 10:10 a.m.

21         POSTERNAK, BLANKSTEIN & LUND, LLP

22              800 Boylston Street

23            Boston, Massachusetts

24    Court Reporter:  Paulette Cook, RPR/RMR
```

Joyce Henderson

2

1  A P P E A R A N C E S:

2

3     EDELMAN, COMBS, LATTURNER & GOODWIN, LLC

4     By Cathleen M. Combs, Esq

5     120 South LaSalle Street

6     Chicago, Illinois 60603

7     312-739-4200

8     ccombs@edcombs.com

9     Counsel for the Plaintiff

10

11    POSTERNAK, BLANKSTEIN & LUND, LLP

12    By Steven S. Broadley, Esq.

13    800 Boylston Street

14    Boston, Massachusetts 02199-8004

15    617-973-6100

16    sbroadley@pbl.com

17    Counsel for the Defendants

18

19

20    ALSO PRESENT:  Lee Harrington, Esquire

21

22

23

24

3

1                         I N D E X

2    Examination of:                              Page

3

4    JOYCE HENDERSON

5     By Mr. Broadley                         4, 39

6     By Ms. Combs                              37

7

8

9

10

11                      E X H I B I T S

12   No.                                          Page

13   1          Notice of Deposition          4

14   2          Complaint - Class Action      9

15   3          Amended Complaint             9

16   4          Collection Letter            19

17   5          Plaintiff's Sworn Statement  25

18

19

20

21

22

23      ** Exhibits retained by Mr. Broadley **

24

4

1            P R O C E E D I N G S

2               (Exhibit No. 1 marked

3                for identification. )

4

5                JOYCE HENDERSON,

6

7   a witness called for examination by counsel for the

8   Defendants, being first duly sworn, was examined and

9   testified as follows:

10

11               DIRECT EXAMINATION

12   BY MR. BROADLEY:

13       Q.   Good morning.

14       A.   Good morning.

15       Q.   Would you state your complete name, please.

16       A.   Joyce Evans Henderson.

17       Q.   Your date of birth, ma'am?

18       A.   11/23/55.

19       Q.   Where do you live at the present time?

20       A.   Two Old Coach Road, Canton, Massachusetts.

21       Q.   How long have you lived there?

22       A.   Seven years maybe.  It's either seven or

23   eight.

24       Q.   Do you own or rent?

Joyce Henderson

5

1      A.   I rent.

2      Q.   Does anyone live there with you at the

3   present time?

4      A.   My husband.

5      Q.   Any children with you?

6      A.   No.

7      Q.   Would you state for me please your present

8   employment?

9      A.   Berklee College of Music.

10     Q.   In what capacity are you employed by

11   Berklee?

12     A.   I am a faculty project manager.

13     Q.   Is that teaching or administrative?

14     A.   Administrative.

15     Q.   Okay.  How long have you been employed by

16   Berklee?

17     A.   About five months.

18     Q.   Getting used to the neighborhood around

19   here.  I wish they'd wait for the cross signs on the

20   crosswalks though.  They never do.

21             (Off the record.)

22   BY MR. BROADLEY:

23     Q.   Prior to Berklee College, what was your

24   employment?

6

```
1        A.   Brandeis University.
2        Q.   And in what capacity did you work there?
3        A.   Administration.
4        Q.   Okay.  How long were you at Brandeis?
5        A.   Two years.
6        Q.   All right.  What is your educational
7   background beginning with high school?
8        A.   I graduated in 1973 from high school.
9        Q.   Where was that?
10       A.   I graduated from Hyde Park High.  I had to
11   think about it.
12       Q.   Is it still there?
13       A.   I think so.
14       Q.   Okay.
15       A.   Undergraduate at U. Mass., graduate
16   Cambridge College, and I am currently in a doctoral
17   program at U. Mass.
18       Q.   For what degree?
19       A.   For an EDD in higher ed administration.  Oh,
20   and there was one other school.  Northeastern,
21   paralegal.
22       Q.   What was your undergraduate degree at U.
23   Mass.?
24       A.   BS in law -- legal studies.
```

Joyce Henderson

7

1    Q.  That was in what year?

2    A.  I think it was in '80.

3    Q.  I can't help you.

4    A.  I know when I got my graduate degree.  I

5    don't remember --

6    Q.  I can't help you with this because I didn't

7    do the research.  So --

8    A.  I think it was in '80.

9    Q.  Apart from your attorneys, have you met with

10   anyone to prepare for today's deposition?

11   A.  No.

12   Q.  Have you discussed the subject of this

13   deposition with anyone other than your attorneys?

14   A.  No.

15   Q.  Have you reviewed any documents in advance

16   of coming here to prepare for this deposition?

17   A.  Yes.

18   Q.  What were the documents that you reviewed?

19   A.  The amended complaint.

20   Q.  Okay.  Anything else?

21   A.  And I think I -- I looked at the motion to

22   dismiss.  Yeah, I think so.

23   Q.  Okay.  Did you bring any other

24   correspondence or other documents with you today --

Joyce Henderson

8

1        A.   No.

2        Q.   Are you currently taking any medication that

3    would affect your ability to hear or understand my

4    questions to your knowledge?

5        A.   No.

6        Q.   Would it be accurate to say you are the

7    named plaintiff in the case of Joyce Henderson

8    against Sherman Financial Group, LLC, and several

9    other parties?

10       A.   Yes.

11       Q.   Do you recognize this document that I'm

12   putting in front of you?

13       A.   Yes.

14       Q.   What is it?

15       A.   It's the complaint, the class action.

16       Q.   That was the original complaint filed in

17   this action?

18       A.   Yes.

19       Q.   By its date stamp, it indicates it was filed

20   -- looks like February 22, '05?

21       A.   I don't see an '05, but I see February 22.

22   Oh, here it is.  Yes.

23       Q.   Okay.  Let me just --

24            MR. BROADLEY:  Can you mark this as

Joyce Henderson

9

1  Exhibit 2?

2              (Exhibit No. 2 marked

3              for identification.)

4      Q.  Let me put another document in front of you

5  and ask if you can identify this for me?

6      A.  Yes.

7      Q.  What is that?

8      A.  That's an amended complaint.

9      Q.  That's the amended complaint you reviewed in

10  advance of coming here today?

11     A.  Yes.

12     Q.  Let me get that one marked, and then we'll

13  have some discussion about that.

14              (Exhibit No. 3 marked

15              for identification.)

16     Q.  I'd like you if you would please to turn to

17  page 3, paragraphs 21 and 22.  Have you read those

18  paragraphs before?

19     A.  Yes, I have.

20     Q.  What is your mother's name?

21     A.  Mary L. Burt.

22     Q.  And that is the person who's referred to as

23  plaintiff's mother in paragraphs 21 and 22, correct?

24     A.  Yes, it is.

Joyce Henderson

10
1    Q.  Can you tell me as of February 22, 2004 what

2  Mary Burt's living circumstances were?

3    A.  She lives in a senior complex which is

4  handicap accessible.  She's about ten minutes from

5  where I live.

6    Q.  In what town or city?

7    A.  Stoughton, Massachusetts.

8    Q.  What is the name or address of the place?

9    A.  It is Stoughton Housing Authority.  They're

10  located at 4 Capen, C A P E N, Street in Stoughton.

11    Q.  Is that the address of the administrative

12  office of the Housing Authority?

13    A.  Yes, it is.

14    Q.  The specific address of the complex where

15  she lives?

16    A.  122A Britton, B R I T T O N, Avenue.

17    Q.  Okay.  How long has she been living at 122A

18  Britton Avenue?

19    A.  Seven or eight years.  She moved around the

20  same time I did.

21    Q.  Okay.  Does she live there alone?

22    A.  Yes.

23    Q.  Is it a separate sort of apartment-style

24  residence?

Joyce Henderson

11

1       A.   Yes, it is.

2       Q.   One bedroom?

3       A.   Yes.

4       Q.   Does she manage her shall we say affairs of

5  daily living independently?

6       A.   No, she does not.

7       Q.   Okay.  Does she eat meals collectively with

8  other people in the complex?

9       A.   No, she does not.

10       Q.   Do people assist her in her apartment with

11  her meals?

12       A.   Yes.

13       Q.   Is that you?

14       A.   With everything.

15       Q.   Is that you?

16       A.   I do along with others.

17       Q.   And others?

18       A.   Yes.

19       Q.   I see.  Okay.  Referring again to the first

20  sentence in paragraph 22 of Exhibit 3, that sentence

21  reads: "Plaintiff handles her mother's affairs."

22  Correct?

23       A.   Yes.

24       Q.   Could you describe for me in as complete a

Joyce Henderson

12

1   way as is necessary what that means when you say --

2   when the complaint says handles her mother's

3   affairs?  What is the scope of that?

4       A.   I hire and sort of supervise her home health

5   aid, homemaker, visiting nurse, physical therapist.

6   I am in constant contact with her doctor.  I am her

7   life support system for her medical alert in her

8   home.  I handle -- I pay all of her bills.

9            I do her grocery shopping, and on many

10  occasions her laundry.  I am responsible for

11  collecting her medications and for taking her to

12  doctors' appointments.  And I think that's about it.

13      Q.   That's all?  Do you have any siblings?

14      A.   Yes, I do.

15      Q.   Any of them within range to help in all of

16  these tasks?

17      A.   I live closer.  I do have a sister in Maine

18  that makes frequent trips to help when possible.

19      Q.   Can you specify any aspects of her daily

20  living that you do not either personally assist with

21  or supervise the management of?

22      A.   Well, I guess her daily meals or daily

23  homemaker -- I mean I'm not there every day.  I talk

24  to them on the phone.  I call my mother two or three

Joyce Henderson

13

1    times a day.  I try to make it my business to be

2    over there a couple of times a week.  So there are

3    days when I'm not physically in her home, and I

4    don't see exactly what's happening.

5              I don't answer her telephone, things of

6    that nature.

7       Q.  But there is some other person at her

8    residence every day to some extent?

9       A.  Yes, every day.

10      Q.  Okay.  Does she still read?

11      A.  Yes.

12      Q.  Does she do any purchasing by phone or

13   otherwise?

14      A.  No.

15      Q.  So at this point if she engages in any

16   commercial transaction, is it your testimony that it

17   passes through your eyes or hands?

18      A.  She will call me, yes.

19      Q.  How long has that situation been in

20   existence?

21      A.  Maybe ten years.

22      Q.  Before she moved to her present residence?

23      A.  Yes.  She was in another senior complex

24   prior, yes.

Joyce Henderson

14

1      Q.   Oh, okay.  As of 2004 -- early 2004 was all

2   your mother's mail being delivered to your home to

3   your knowledge?

4      A.   No.

5      Q.   So at that point she still received some

6   mail independently at the place where she lives?

7      A.   Yes.

8      Q.   And does she still receive some mail

9   directly there?

10     A.   Yes.

11     Q.   Is there a particular pattern that you are

12   aware of about what kind of mail she receives there

13   as opposed to through your house?

14     A.   Yes.

15     Q.   And what is that?

16     A.   The mail she receives at home are utility

17   bills basically, telephone, light and cable.

18     Q.   Was that set up purposefully, or is that

19   just the way it fell out?

20     A.   It's the way it fell out.

21     Q.   Just never changed 'em from that residence

22   to some remote location or --

23     A.   No.

24     Q.    -- do the utilities prefer it --

Joyce Henderson

15

1       A.   No, no.   The reason that other bills which
2    would be basically credit card bills come to my home
3    is because for every credit card that my mother had
4    I also had a card with the same number so that I was
5    able to make her purchases for her.   So those bills
6    came to me.
7       Q.   For the second card on every credit card
8    account that she had, is that a card that had her
9    name on the card or yours?
10      A.   Mine.
11      Q.   And as to any of the purchases using your
12   card, did any of those -- were any of those
13   purchases made for your interest rather than hers?
14      A.   Some, yes.
15      Q.   So that there were -- you used some of the
16   credit card accounts not for her needs but for
17   yours?
18      A.   Yes, under her direction.
19      Q.   Understood, yeah.   I'm --
20      A.   Yes.   Yes.
21      Q.   We can then say for every one of her -- it
22   wasn't the case that all of the purchases under her
23   credit cards were for her consumer interest
24   directly?

16

1    A.   True, yes.

2    Q.   Okay.  Now I may have asked you this, and

3    you probably answered it then.  How long have you

4    been handling your mother's financial affairs?

5    A.   About ten years.

6    Q.   Was there a particular event or conversation

7    that led to your taking that over, or was it a

8    gradual process?

9    A.   It was a gradual process, but more than

10   that, it was due to her failing health and not being

11   able to do certain things and needed to still have

12   things done.

13   Q.   Have you ever been given a written power of

14   attorney to act for your mother in a legal capacity?

15            MS. COMBS:  Object.  Calls for a legal

16   conclusion.  She can answer.

17   Q.   Do you know what a power of attorney is

18   generally?

19   A.   Yes.

20   Q.   Okay.  Has your mother ever executed a power

21   of attorney to allow you to act for her?

22   A.   No.

23   Q.   Has your mother ever been under any sort of

24   guardianship -- formal guardianship?

17

1      A.   Just a proxy -- medical proxy.

2      Q.   The healthcare or medical proxy?

3      A.   Yes.

4      Q.   That's a document that she and you

5    executed --

6      A.   Yes.

7      Q.   -- regarding authority to act for her in

8    medical matters?

9      A.   Yes.

10      Q.   But there's never been an action filed in a

11    court to declare her in need of a guardian?

12      A.   No.

13      Q.   As you said, she still reads?

14      A.   She does.

15      Q.   Reads letters, reads books?

16      A.   She does.

17      Q.   As of 2004, was your mother still signing

18    independently any necessary documents such as

19    authorizations and checks and so on?

20      A.   Yes.

21      Q.   Okay.  And can she --

22      A.   Well -- independent?

23      Q.   Let me ask it over -- I'll -- strike the

24    question.

18

1    A.  Okay.

2    Q.  When was the last time that your mother

3    signed any checks drawn on a bank account in her

4    name?

5    A.  Sunday.

6    Q.  Okay.  So as of 2004 when checks were issued

7    on her bank account, she still signed them?

8    A.  She signed them, yes.  I'd make them out.

9    She signs them.

10   Q.  Understood.  The actual signature --

11   authorizing signature on the check was your

12   mother's?

13   A.  Yes.

14   Q.  And she's still doing that?

15   A.  Yes.

16   Q.  So payments made for her personal needs, the

17   utilities, whatever it may be, she still to the

18   present time signs the necessary check?

19   A.  Yes.

20   Q.  And you assist her in the preparation of the

21   payee and so on?

22   A.  Yes.

23   Q.  Okay.  Will you look at this?  It's a

24   two-sided document.

Joyce Henderson

19

1      A.   Yes.

2      Q.   Tell me if you recognize that.

3      A.   Yes.

4      Q.   Will you tell me what that is?

5      A.   This is a collection form letter.

6      Q.   Okay.   It's a copy of a letter that was

7   received at your house in February 2004?

8      A.   Yes.

9      Q.   It's addressed to Mary L. Burt care of Joyce

10  Henderson?

11     A.   Yes.

12     Q.   Okay.

13          MR. BROADLEY:   Could I have the reporter

14  mark that, please.

15          (Exhibit No. 4 marked

16          for identification.)

17     Q.   Miss Henderson, before I ask you questions

18  about that, can you estimate for me as of early 2004

19  how many credit card accounts there were in your

20  mother's name for which you had an extra card?

21     A.   I'm going to say three.

22     Q.   Do you have -- do you know the names of the

23  cards or the card issuers?

24     A.   I would have to say Sears, Discover and

Joyce Henderson

20

1   Citibank.

2       Q.  Master or Visa?

3       A.  Master.

4       Q.  As of early 2004 -- strike that.

5               Had there been more cards at an earlier

6   date but some of them had been canceled?

7       A.  Paid off and closed, not canceled.  Closed.

8       Q.  Okay.

9       A.  My discretion.

10      Q.  As of early 2004, did you have an awareness

11  of the last time that the Sears credit card had been

12  used -- actually used for a purchase?

13      A.  No, I can't say.  No idea.

14      Q.  Have you had occasion at all in the last

15  year and a half to go back and look at any records

16  to determine that?

17      A.  No.

18      Q.  In the case of the Sears, Discover or

19  Citibank cards, your testimony is that you were

20  holding an extra card authorizing you to make

21  charges on those accounts?

22      A.  Yes.

23      Q.  Okay.  But the accounts were wholly in your

24  mother's name?

21

1       A.   Yes.

2       Q.   And was the address on each of those

3    accounts your address in Canton?

4       A.   Yes.

5       Q.   But all of the identifying information in

6    connection with those accounts related to your

7    mother directly, correct?

8       A.   Yes.

9       Q.   For example, your social security number

10   wasn't associated with any card materials?

11      A.   Yes, it was.

12      Q.   Your social security number was?

13      A.   Yes.

14      Q.   In what way?

15      A.   For an additional card that's one of the

16   factors that they ask as well as my credit file

17   being affected, yes.

18      Q.   You requested an additional signing card and

19   in connection with that the company sought to have

20   your identifying information?

21      A.   Yes.

22      Q.   Okay.  And your credit information?

23      A.   It appeared on my credit report, yes.

24      Q.   Even though the card was not in your name?

Joyce Henderson

22

1      A.  Yes.

2      Q.  Okay.  Do you have materials that reflect

3  the appearance of the card in your mother's name on

4  your credit account?  I don't mean with you today.

5      A.  Oh.  Yes.

6      Q.  Okay.  As of 2004, did you have credit card

7  accounts in your own name independent of your

8  mother?

9      A.  Yes.

10      Q.  Did you have a Sears card in your own name

11  independent of your mother's?

12      A.  No.

13      Q.  Looking at Exhibit 4, can you tell me how

14  this -- the original of this letter first came to

15  your attention?

16      A.  How it first came to my attention?

17      Q.  Correct.

18      A.  In the mail.

19      Q.  Okay.  Was there anything in the envelope --

20  well, I assume it came in an envelope?

21      A.  Yes.

22      Q.  Was there anything in the envelope other

23  than a single letter?

24      A.  Not that I can remember.

Joyce Henderson

23

1    Q.   Was it one page two-sided roughly like this?

2    A.   Yes.  Yes.

3    Q.   Okay.  And did you personally open the

4    letter?

5    A.   Yes.

6    Q.   That would have been your ordinary course in

7    receiving anything that was addressed to your mother

8    in care of you?

9    A.   Yes.

10   Q.   At that point in February 2004 did you have

11   your mother's financial records wholly at your own

12   residence?

13   A.   No.

14   Q.   Okay.  So that her records of purchases and

15   of charge accounts and credit cards and so on were

16   still being kept at Britton Avenue where she lived?

17   A.   No.  That's not the question that you asked.

18   Q.   Okay.

19   A.   I have some records, and she had some

20   records.

21   Q.   Okay.  Were all of the current, meaning

22   within the prior two or three months of February

23   2004, all of her current financial records at your

24   house at that time?

Joyce Henderson

24

```
 1        A.   For certain finances, yes.
 2        Q.   Did you at any time discuss the receipt of
 3   this letter with your mother?
 4        A.   I don't remember.
 5        Q.   Did you ever at any time show the original
 6   of this letter to your mother?
 7        A.   Doubtful.
 8        Q.   Let me show you a two-page -- a three-page
 9   document and ask if you recognize that?
10        A.   Hm Hm.
11        Q.   Is this a document that you signed in -- a
12   month or two ago?
13        A.   Yes.
14        Q.   Is your signature on page 2?
15        A.   Yes.
16        Q.   Okay.  And this is a document entitled
17   plaintiff's sworn statement in accord with Local
18   Rule 26.1?
19        A.   Hm Hm.
20        Q.   Now looking near the bottom of the first
21   page, under the second bold heading response --
22        A.   Yes?
23        Q.    -- the sentence reads: "Plaintiff
24   identifies herself as having information relating to
```

25

1   her receipt and review of the Privacy Notice."

2               You haven't listed here your mother as

3   having any information relating to your receipt and

4   review of the Privacy Notice, correct?

5       A.   Correct.

6       Q.   Okay.  Does that indicate or does that

7   refresh your recollection as to whether you ever

8   showed your mother the notice?

9       A.   As I said, it's doubtful.

10              MR. BROADLEY:  Can we mark this Exhibit

11  5, please.

12              (Exhibit No. 5 marked

13              for identification.)

14      Q.   Moving back to Exhibit 4 which is the letter

15  itself.

16      A.   Yes.

17      Q.   Prior to February 2004, had you received

18  earlier correspondence from Sears regarding this

19  account and amounts due on the account?

20      A.   Yes.

21      Q.   Had you received anything from Sears other

22  than ordinary monthly statements regarding the

23  account?

24      A.   Yes.

Joyce Henderson

26

1    Q.    You'd received collection letters from them?

2    A.    Calls, collection, yes.

3    Q.    Were they all directed to you either by

4    phone or mail at your residence?

5    A.    Yes.

6    Q.    Had you had discussions with your mother

7    regarding those communications from Sears prior to

8    receiving what's been marked Exhibit 4?

9    A.    Yes.

10    Q.    So as of February 2004, to your personal

11    knowledge your mother was clearly aware there was an

12    outstanding balance due on the Sears account?

13    A.    Oh, yes.

14    Q.    Had you received prior to February 2004 any

15    correspondence from any independent party other than

16    Sears about this Sears account?

17    A.    I'm sure I did.  I don't know offhand.

18    Q.    Do you know when you first received an

19    additional authorized charge card on this Sears

20    account?

21    A.    The exact date?  No.

22    Q.    No, roughly.

23    A.    Oh.  Several years.

24    Q.    Several years before 2004?

Joyce Henderson

27

1      A.   Yes.

2      Q.   Did you in addition to getting that

3    additional card execute a particular application

4    form?

5      A.   No.

6      Q.   Did you have to sign any document that was

7    submitted to Sears?

8      A.   No.

9      Q.   What was the form in which you say you

10   submitted other information about yourself to Sears?

11     A.   I didn't say to Sears.  I said to other

12   creditors, and I have.  I think that was your

13   question -- have I ever had to and I said, yes, I

14   have had to.  I don't believe I had to with Sears.

15     Q.   So to your knowledge you didn't submit at

16   any time any personal identifying information about

17   yourself to Sears in connection with this account?

18     A.   I don't recall having to give them a license

19   or anything on that nature.  They were very willing

20   to give a credit card to someone that said they were

21   me, yeah.  I don't recall having to do that.

22     Q.   Without verifying your name, social security

23   number or anything else about you?

24     A.   Pretty much.

28

1    Q.  After you received -- strike that.

2         Was Exhibit 4 the first correspondence

3    that you received from Alegis Group, LP about the

4    Sears account?

5    A.  I don't know.

6    Q.  Do you know if after February 24, 2004 you

7    received any subsequent correspondence in writing

8    from Alegis Group, LP?

9    A.  I don't believe so.

10   Q.  Do you know whether after February 24, 2004

11   you had received any correspondence regarding this

12   account or this obligation from any of the entities

13   named as defendants in this case?

14   A.  I don't know if it's from these people in

15   particular 'cause when I receive correspondence I

16   send it off to the attorney that handles those

17   affairs.

18   Q.  Who's that?

19   A.  So it may in fact be from these people.

20   When I receive more debt correspondence, I

21   immediately forward it off.  So I don't know who

22   it's from.  I don't look anymore.

23   Q.  When you receive this --

24   A.  I mean I read it and I say, oh, this is from

29

1   and I forward it off.

2       Q.  When you received the original of what's

3   been marked as Exhibit 4, what did you specifically

4   do with that piece of correspondence?

5       A.  I read it.  I was very surprised at what it

6   said, and I sent it off to Jeremy Lamet.

7               MS. COMBS:  Jerry?

8               THE WITNESS:  Jerry.

9               MS. COMBS:  Jeremy is from our office.

10      A.  There's Jeremy, and there's Jerry.  I

11  apologize.  Jerry.

12      Q.  Is Jerry an attorney?

13      A.  Yes.

14      Q.  In Massachusetts?

15      A.  No.

16      Q.  Okay.  When you received this letter in

17  February 2004, had you already established a

18  relationship with an attorney to whom you sent

19  similar letters?

20      A.  Yes, I believe so.

21      Q.  So you had received on your mother's account

22  some other letters regarding debts or obligations?

23      A.  Yes.

24      Q.  And had started a practice of sending them

30

1    to an attorney at that point?

2        A.   Yes.

3        Q.   Were you at the same time receiving other

4    correspondence regarding obligations that were your

5    own independent of your mother's?

6        A.   No.

7        Q.   When you received the original of the

8    document which has been marked Exhibit 4, did you

9    read the information on the reverse?

10       A.   Yes.

11       Q.   As you read the original of what's been

12   marked Exhibit 4, did you determine that there was

13   anything on that letter or in the letter concerning

14   you personally other than your name and address on

15   the front?

16       A.   Well, yes.

17       Q.   What?

18       A.   I mean anything that concerns my mother I

19   feel concerns me personally since I care for her and

20   -- physically care for her and emotionally care for

21   her, I'm very concerned.  I mean she calls me for

22   all of her affairs.  She does nothing without

23   consulting me.  Of course, if I see her name, I am

24   going to take a personal interest.

Joyce Henderson

31

1         So as I read the letter and having been

2   told by a financial agency that Sears had reported

3   on my credit account -- my own personal credit file,

4   I, of course, read the letter carefully, and I found

5   it to be very personable and threatening to both me

6   and my mother, yes.

7        Q.   Who advised you that Sears had reported this

8   obligation on your personal credit account?

9        A.   An agency called Profina Debt Counseling.

10       Q.   Can you spell that?

11       A.   P R O F I N A.

12       Q.   Debt Counseling?

13       A.   Yes.

14       Q.   And where are they located?

15       A.   I don't know.  They have a toll-free number.

16   I saw them on television and wanted to find a way to

17   help my mother to take care of her debts and phoned

18   them.

19       Q.   Did you have occasion to look at any

20   information about your mother's credit history?

21       A.   No, I have not looked at her credit history.

22       Q.   Ever?

23       A.   Maybe once, but, no, I have not.

24       Q.   You did not research her credit history or

Joyce Henderson

32

1    reporting about her in connection with --

2         A.   Oh, yes, I did.

3         Q.   -- receiving this letter?

4         A.   Yes.  Yes.

5         Q.   Okay.  And did you obtain any documents

6    which reflected the reporting by Sears or anyone

7    else of this obligation -- this obligation based on

8    the Sears account on your mother's credit history?

9         A.   No.  I didn't request a copy.

10        Q.   Okay.  How did you observe the effects of

11   any reporting on your mother's credit history?

12        A.   Physically observing, I did not see it.  I

13   was talking to Profina on the phone about arranging

14   a payment or a way of paying the debt, and they

15   pulled up my credit file, and they pulled up my

16   mother's credit file and said it is your mother's

17   debt and you are reported.

18             I said -- she said that you need to have

19   this removed from your credit file 'cause that's not

20   a proper standard.  She gave me information

21   regarding an attorney that would help me to work

22   through my mother's debts.  It was prior to this

23   letter, but that was also an issue with Sears as a

24   creditor.  That was one of the reasons why I called.

Joyce Henderson

33

1      Q.   So you heard about the reporting of this

2    obligation which is your mother's obligation on your

3    credit history from another person --

4      A.   From a counseling service, yes.

5      Q.   Did you ever get a copy of your own credit

6    report?

7      A.   Yes, I did.

8      Q.   And at what point -- have you done that more

9    than once?

10     A.   I've been working with -- there are three

11   different credit agencies or reporting agencies.  So

12   I have gotten more than one copy because as I make

13   changes they send it back, and they send me new

14   ones.  Yes, I've had a couple of copies.

15     Q.   Did you have in your possession a copy of

16   your credit report reflecting this Sears obligation

17   on your credit history before you received this

18   document which is Exhibit 4?

19     A.   No.  I don't have a copy that says this was

20   on here prior.  The copy of my credit report that I

21   received was maybe about a year ago, and I have been

22   sort of cleaning it.  And it was on that copy prior

23   to my having removed.

24     Q.   So the obligation based on the Sears credit

Joyce Henderson

34

1   card was reported on something that you got about a

2   year ago -- a copy of your credit report?

3       A.  Yes.  It had just been up there for a while.

4       Q.  Did the credit report reflect who posted it

5   to your credit history?

6       A.  I don't know.  I'm sure it did.  I don't

7   know anything about the posting.

8       Q.  Okay.  What did you do to remove it from

9   your credit report?

10      A.  I contacted the reporting agency and told

11  them I had a dispute with that.  They do a -- I

12  think it's a ten-day or twenty-day and they have to

13  contact the company.  When I got it back, it was

14  gone.

15      Q.  The basis for your saying you had a dispute

16  was what?

17      A.  I did not actually complete an application

18  and request a Sears credit card.

19      Q.  Okay.  So that it was on your credit report

20  to your knowledge for some period of time, but it's

21  not there now?

22      A.  No, it is not.

23      Q.  And upon your disclosure to the credit

24  reporting agency that it was your mother's card,

35

1  that was the basis to your knowledge in which it was

2  removed from your credit history?

3       A.  Yes, but I know that there was a question

4  about it because my mother did have to sign

5  something allowing me to have a card, and they said

6  that I was still liable.  And it took some time.  It

7  was more than one reviewing of the credit file

8  before it was gone.

9       Q.  Did you have an opportunity to read through

10 the document which has been marked Exhibit 2, the

11 complaint, before it was filed in the United States

12 District Court?

13      A.  I believe so.

14      Q.  Do you know if your mother has ever seen

15 that document?

16      A.  Yes, she did.

17      Q.  And when was it that she saw it if you know?

18      A.  She saw the document prior to the

19 finalization of the document.  It came to me, and I

20 went to her.  I believe at that time both names even

21 appeared and I went to her, and we talked about it.

22 My not being an attorney, I tried to explain to her

23 as best I could.  I had questions.  I telephoned the

24 attorney to find out --

36
1       Q.   Okay, I don't need to ask you what went on

2    between you and the attorney.

3       A.   Okay, but she did see it.

4       Q.   Is it your testimony here that at some point

5    you saw a draft of what's been marked Exhibit 2 that

6    had your name and your mother's name on it as

7    plaintiffs?

8       A.   I'm not sure if it had both names, but I

9    think it was something that -- for some reason I saw

10   her name and I felt that she needed to discuss it --

11   that we needed to talk about it, yes.

12      Q.   Okay.  Based on your personal interaction

13   your mother is aware that you're a plaintiff in this

14   action?

15      A.   Yes.

16      Q.   Okay.  And your mother knows that there is

17   at least some information in this complaint about

18   her, correct?

19      A.   Yes.

20      Q.   And that attached to the complaint is a

21   letter addressed to her about one of her

22   obligations?  She's aware of that?

23      A.   Yeah, yeah, she's aware.

24      Q.   Okay.  Is it your understanding that you

Joyce Henderson

37

1   have no personal obligation to satisfy the claims

2   that are reflected in this Sears obligation?

3              MS. COMBS:  I'm going to object.  It

4   calls for a legal conclusion, but she can answer.

5              THE WITNESS:  Should I answer?

6              MS. COMBS:  Yes, you should answer.

7        A.  Yes.  I do have a personal stake.

8        Q.  You have a personal stake in it?

9        A.  Well, I have -- personally I feel that I am

10  responsible, yes.

11       Q.  Do you have a sense of how much of the

12  amount owed on that obligation is based upon

13  purchases for your personal use?

14       A.  No, 'cause it wasn't just for my personal

15  use, and it wasn't just for my mother's personal

16  use.  So, no, I can't say I have $30 or whatever.  I

17  think collectively the bill's probably half of what

18  they say is owed.  The rest of it being interest and

19  fees.  So I would say probably half of whatever they

20  claim.

21       Q.  I think we're almost done.  Just give me a

22  couple of minutes.

23              (A recess was taken.)

24  CROSS-EXAMINATION BY MS. COMBS:

Joyce Henderson

38

1     Q.   I just have a couple of questions.  Have you
2     ever applied for a Sears credit card?
3     A.   Yes.
4     Q.   Did you get one?
5     A.   No.
6     Q.   Did they tell you why you were denied a
7     Sears credit card?
8     A.   Because of the Sears credit card my name is
9     on, and the credit was not -- in their opinion it
10    wasn't good credit.
11    Q.   So are you saying because of -- was there a
12    reference to your mother's Sears credit card --
13    A.   Yes.
14    Q.    -- when you applied for your own
15    independent Sears credit card?
16    A.   Yes.
17    Q.   They told you they were denying you credit
18    because of the fact you already had a credit card?
19    A.   Exactly.
20    Q.   Have you ever personally made payments on
21    your mother's account from your own funds?
22    A.   Oh, yes.
23    Q.   Can you estimate how many payments -- how
24    much money was actually paid on that account from

39

1    your own personal payments?

2        A.   I would say nothing short of a thousand,

3    $1500.

4        Q.   Can you estimate -- All right.

5             MS. COMBS:   I have no further questions.

6             MR. BROADLEY:   One followup.

7    REDIRECT EXAMINATION BY MR. BROADLEY:

8        Q.   When did you apply for the Sears credit card

9    you were just questioned about?

10       A.   It was prior to -- I don't know the exact

11   date.   I do know that my husband was able to get a

12   card, but I was not because I've had a card; he

13   didn't.   So I don't know the exact date.   A couple

14   of years.

15       Q.   Was it before your receipt of the letter

16   marked Exhibit 4?

17       A.   I think it was before that.

18             MR. BROADLEY:   Nothing further.

19             MS. COMBS:   Thank you.   We'll reserve

20   signature.   Thank you all.

21              (Whereupon the proceedings

22               adjourned at 11:10 a.m.)

23

24

Joyce Henderson

40

1                    C E R T I F I C A T E

2      I, JOYCE HENDERSON, do hereby certify

3   that I have read the foregoing transcript of my

4   testimony, and further certify that it is a true and

5   accurate record of my testimony (with the exception

6   of the following corrections listed below):

7   Page  Line              Correction

8   ____  ____    _____

9   ____  ____    _____

10  ____  ____    _____

11  ____  ____    _____

12  ____  ____    _____

13  ____  ____    _____

14  ____  ____    _____

15  ____  ____    _____

16  ____  ____    _____

17  ____  ____    _____

18

19     Signed under the pains and penalties of

20  perjury this ____ day of _____,

21  2005.

22

23         _____

24              JOYCE HENDERSON

Joyce Henderson

41

1                    CERTIFICATE

2    COMMONWEALTH OF MASSACHUSETTS)

3    SUFFOLK, SS.                    )

4

5        I, Paulette M. Cook, Registered Merit Reporter

6    and Notary Public in and for the Commonwealth of

7    Massachusetts, do hereby certify that JOYCE

8    HENDERSON, the witness whose deposition is

9    hereinbefore set forth, was duly sworn by me and

10   that such deposition is a true record of the

11   testimony given by the witness.

12       I further certify that I am neither related to

13   or employed by any of the parties in or counsel to

14   this action, nor am I financially interested in the

15   outcome of this action.

16       In witness whereof, I have hereunto set my hand

17   and seal this 3rd day of November, 2005.

18

19

20                *Paulette M. Cook*

21              Notary Public

22

23   My commission expires:

24   March 8, 2007

15 S. MAIN ST., SUITE 60
GREENVILLE, SC 29601

ADDRESS SERVICE REQUESTED

|||||||||||||||||||
9834922

`LEGIS GROUP LP
1-800-580-4060
(713)784-9966
Hours of Operation
8AM-9PM EST Monday - Thursday
8AM-12PM EST Friday - Saturday

PREVIOUS CREDITOR: Sears
CURRENT CREDITOR: Sherman Acquisition II LP
ACCOUNT NUMBER: Redacted
CURRENT BALANCE: $10,532.47

02-24-2004

#BWNDLZK
#G000 04CY MDV1#
||||...||.||....||...||..||..||..||...|.|.|.||...||..||..||..||
MARY L BURT                    4161
C/O JOYCE HENDERSON             IX2
2 OLD COACH RD                  SKFW-HS
CANTON MA 02021-1623

ALEGIS GROUP LP
PO BOX 741148
HOUSTON TX 77274-1148
||..||...|.|.||.|.||..||.||..||..||.|.|.||.|.|..||.|.||..||

---

*IMPORTANT: To receive proper credit, be sure to enclose this portion with your payment in full.*

Dear MARY L BURT:

Sherman Acquisition II LP has authorized Alegis Group LP to offer a settlement in lieu of the balance owed on your account number Redacted

This offer is being made for a limited time only. Alegis Group LP can only accept settlement of the above debt if payment is received in our office no later than fifteen (15) days from the date of this letter.

In the event that all terms of this letter are met, Sherman Acquisition II LP agrees that all collection efforts against MARY L BURT for the above named account will cease and said account will be considered satisfied.

*This communication is sent to you by Alegis Group LP, a professional debt collector.*

**Please read the following important notices as they may affect your rights.**

This communication is from a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.

You have the right to make a written or oral request that telephone calls regarding your debt not be made to you at your place of employment. Any such oral request will be valid for only ten (10) days unless you provide written confirmation of the request postmarked or delivered within seven (7) days of such request. You may terminate this request by writing to the collection agency. If you wish to discuss this matter, please call us direct between the hours of 8 AM and 5 PM EST at the toll free number listed on this letter.



EXHIBIT
*Henderson* 4
*PMC 11-1-05*

SEE REVERSE SIDE FOR IMPORTANT PRIVACY NOTIFICATION FROM YOUR CREDITOR

# **REFERENCE**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | | |
|---|---|---|
| JOYCE HENDERSON; | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 05-10339 |
| v. | ) | |
| | ) | Judge Joseph L. Tauro |
| SHERMAN FINANCIAL GROUP LLC; | ) | |
| SHERMAN ACQUISITION II, LP; | ) | Magistrate Judith G. Dein |
| SHERMAN ACQUISITION II | ) | |
| GENERAL PARTNER LLC; | ) | |
| ALEGIS GROUP L.P.; and | ) | |
| ALEGIS GROUP LLC; | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S SWORN STATEMENT IN ACCORDANCE WITH LOCAL RULE 26.1(B)

Plaintiff, Joyce Henderson, on advice of her counsel, and pursuant to Local Rule 26.1(B) and the Court's order of August 29, 2005, states as follows:

26.1(b)(1)(a) - Itemization of economic loss and a computation of damages for which recover is sought, if any, sustained before the date of service of process.

**Response**: Plaintiff seeks statutory damages, capped at $1,000 per individual and the lesser of 1% of the defendant's net worth or $500,000 for the class. Plaintiff also seeks statutory damages under M.G.L. Ch. 93A of $75 individually, and $25 per class member.

26.1(b)(1)(b) - persons known to claimant and claimant's attorney who witnessed or participated in the transaction or occurrence giving rise to the claim or otherwise known or believed to have substantial discoverable information about the claim or defenses, together with a statement of the subject and a brief summary of that information:

**Response**: Plaintiff identifies herself as having information relating to her receipt and review of the privacy notice. Plaintiff further identifies the following persons from defendants who may have information relating to the claims and defenses arising from the Complaint - Steve Lawrence, Laura Schaible, Brett Hildebrand, Scott Silver, and Robert Roderick.

26.1(b)(1)(c) - all opposing parties, and all officers, directors, and employees to opposing parties, from whom statements have been obtained by or on behalf of the claimant regarding the



EXHIBIT
Henderson 5
PMC 11-1-05

subject matter of the claim:

  **Response**:  Plaintiff has not obtained any statements from any opposing party or any officer, director, or employee of any opposing party.  Plaintiff did obtain written discovery responses from some of the defendants during the pendency of the fourteen class action lawsuits which were filed in Illinois, Indiana, Michigan, and Wisconsin.

  26.1(b)(1)(d) - all governmental agencies or officials then known to the claimant or the claimant's attorney to have investigated the transaction or occurrence giving rise to the claim:

  **Response**:  Plaintiff is not aware of any governmental agency or official that has investigated the transaction or occurrence giving rise to the claims raised by the Complaint.

Respectfully submitted,

Daniel A. Edelman
Jeremy P. Monteiro
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, IL 60603
(312) 739-4200
(312) 419-0379 (FAX)

Christopher M. Lefebvre
Law Offices of Claude Lefebvre & Sons
P.O. Box 479
Pawtucket, RI  02862
(401) 728-6060
(401) 728-6534 (FAX)

Joyce Henderson
2 Old Coach Rd.
Canton, MA 0202-1623

## CERTIFICATE OF SERVICE

I, Jeremy P. Monteiro, hereby certify that on September 19, 2005, a copy of the foregoing **PLAINTIFF'S SWORN STATEMENT PURSUANT TO LOCAL RULE 26.1(b)** was served via U.S. Mail and Facsimile upon the below listed parties.

Steven S. Broadley
Jennifer L. Finger
**Posternak Blankstein & Lund, LLP**
Prudential Tower
800 Boylston Street, 32nd Floor
Boston, MA 02199-8004
(617) 367-2315 (Fax)

Michael S. Poncin, Esq.
**Moss & Barnett, P.A.**
4800 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 339-6686 (Fax)

Christopher M. Lefebvre
**Law Offices of Claude Lefebvre & Sons**
P.O. Box 479
Pawtucket, RI  02862
401-728-6534 (Fax)

Jeremy P. Monteiro

Daniel A. Edelman
Jeremy P. Monteiro
EDELMAN, COMBS, LATTURNER
& GOODWIN LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

3